IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
July 26, 2022 Session

## STATE OF TENNESSEE v. WILLIAM SCOTT WARWICK

**Appeal from the Criminal Court for Knox County**
**No. 118139   Steven Wayne Sword, Judge**

_____

## No. E2021-01077-CCA-R3-CD

_____

A Knox County jury convicted the defendant, William Scott Warwick, of three counts of assault by offensive or provocative touching, a Class B misdemeanor, and three counts of sexual contact with a minor by an authority figure, a Class A misdemeanor. Following a sentencing hearing, the trial court imposed an effective sentence of 2 years, 11 months, and 27 days at 75 percent, suspended to supervised probation after serving 90 days in confinement. On appeal, the defendant argues the trial court erred in imposing split confinement. After reviewing the record and considering the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR. and TIMOTHY L. EASTER, JJ., joined.

Scott Lanzon (on appeal and at trial) and Steve Sharp (at trial), Knoxville, Tennessee, for the appellant, William Scott Warwick.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Charme Allen, District Attorney General; and Tammy Hicks and Sarah Winningham Keith, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### *Facts and Procedural History*

On October 28, 2020, a Knox County Grand Jury indicted the defendant for three counts of aggravated sexual battery (counts one, two, and three) and three counts of sexual

contact with a minor by an authority figure (counts four, five, and six). The defendant was charged with abusing M.T., a child he had been mentoring for two years.[1] The victim, who was born on December 10, 2009, was eleven years old at the time of trial.

The allegations against the defendant arose between August and October 2020. The defendant was first introduced to the victim and his older brother, A.M., when they attended vacation bible school at Gillespie Avenue Baptist Church with a family friend. The defendant, who volunteered at the vacation bible school, befriended the brothers and asked their mother if he could mentor them after learning that they did not have a consistent father figure in their lives. He told the victim's mother that he had worked with the Big Brothers, Big Sisters program for 25 years, and she agreed to allow him to spend time with the victim and his brother. Over the next two years, the defendant took the brothers to baseball games, shopping trips, trampoline parks, and amusement parks, including an overnight trip to Universal Studios in Florida. However, the defendant was rarely alone with either of the brothers.

In August 2020, during the first week of school, the defendant began taking the victim and his brother to and from school. However, after the third day of school, the victim's brother began attending school virtually due to a medical condition, leaving the victim to ride alone with the defendant. Each morning, when the victim came downstairs, he went to the driver's side window and leaned in to give the defendant a hug. At first, the defendant gave the victim a kiss on the cheek. However, this soon progressed to kisses on the lips, and the victim could feel the defendant's tongue in his mouth. On the way to and from school, the victim sat in the front seat of the defendant's car, and the defendant rubbed the victim's thigh and groin area "almost every day." Although the defendant did not touch the victim's penis, he was "close."

On October 5, 2020, the defendant took the victim to and from school as usual. After school, he took the victim, the victim's brother, and his brother's friend to Main Event, an entertainment center. Amanda May, the director of the Blount County Juvenile Court, was at Main Event with her family when she saw the defendant and the victim sitting at a table together. The defendant had his legs spread open, and the victim's legs were in between the defendant's. As Ms. May watched the defendant, he began "caressing" the victim's knee before he slowly made his way up to the victim's hip and inner thigh. Ms. May began recording the interaction when she saw what she believed was the defendant touching the victim's genital area. However, once she started recording, the defendant did not go back toward the victim's inner thigh area. At that point, Ms. May sent the video to the judge she worked for and asked what she should do; however, she did not disclose that

---

[1] It is the policy of this Court to refer to victims of sexual abuse by their initials. For purposes of this opinion, "the victim" will refer to M.T. unless otherwise noted.

she had seen the defendant touch the victim's genital area. The judge told Ms. May that she might be witnessing "an overly affectionate family," so Ms. May decided to "let it go."

After playing video games with her son, Ms. May returned to where her husband was sitting, which was near the defendant. When she looked at the defendant's table, Ms. May noticed the defendant and the victim were joined by two older boys. While the older boys were at the table, Ms. May did not notice any inappropriate behavior, but as soon as the older boys left, the defendant began caressing the victim's back, so Ms. May decided to start recording again. The back caresses started at the top and slowly got lower until Ms. May observed the defendant "put[] his hands down the back of the [victim's] pants." The defendant also started kissing the victim on the temple, moving down his face to the victim's lower jaw. Ms. May was "sick to [her] stomach," so she stopped the recording and called 911. Although not included in the second video, Ms. May testified the defendant continued kissing the victim's face, including on the "lip area."

Officer Jordan Hardy with the Knoxville Police Department ("KPD") responded to the scene. After speaking with Ms. May and the defendant and watching Ms. May's videos, Officer Hardy contacted the Special Crimes Unit to continue the investigation. Detective Patty Tipton with the KPD Special Crimes Unit responded to Main Event and spoke with the victim and his mother, who had arrived at the scene. Detective Tipton also spoke with the defendant and informed him that he was to have no further contact with the victim or his family until the investigation was over.

On October 9, 2020, the victim gave a forensic interview at Child Help Children's Center of East Tennessee, which was witnessed by Detective Tipton. Immediately following the victim's forensic interview, Detective Tipton went to the defendant's home and took a recorded statement in which the defendant admitted to giving the victim "love pat[s]" on the thigh. He also told Detective Tipton that he kissed the victim on the top of the head, cheek, forehead, and nose but that the victim initiated any kisses on the mouth. When asked if the victim had put his tongue in the defendant's mouth or if he put his tongue in the victim's mouth, the defendant could not recall that happening. The defendant also denied ever touching the victim's penis. When Detective Tipton confronted the defendant with the information in Ms. May's videos, the defendant stated he "didn't go inside of [the victim's] underwear – inside of his – I just – I guess, maybe I did. I mean -- I'm not – and if you've got video, that proves it. I'm sure it's there."

Following deliberations, the jury found the defendant guilty of three counts of the lesser-included offense of assault by offensive or provocative touching (counts one, two, and three) and three counts of sexual contact with a minor by an authority figure as charged in the indictment (counts four, five, and six). The trial court subsequently imposed a sentence of six months at 75 percent for counts one, two, and three and 11 months, 29 days

at 75 percent for counts four, five, and six. The trial court ordered counts one, two, and three to be served concurrently with each other and with count four, and ordered counts five and six to be served consecutively with each other and with count four for an effective sentence of 2 years, 11 months, and 27 days. The trial court then ordered split confinement consisting of 90 days in jail and the balance on supervised probation. This timely appeal followed.

*Analysis*

The defendant's sole issue on appeal is the trial court's imposition of split confinement. Specifically, the defendant argues that 90 days of incarceration is "unnecessary when taking into consideration the purposes and intent of sentencing and principles that apply to confinement." The State contends the trial court acted within its discretion when it denied full probation and imposed a sentence of split confinement. We agree with the State.

When an accused challenges the length and manner of service of a sentence, this Court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness for within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying the standard to alternative sentencing). In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In misdemeanor sentencing, the "trial court need only consider the principles of sentencing and enhancement and mitigating factors in order to comply with the legislative mandates of the misdemeanor sentencing statute." *State v. Troutman*, 979 S.W.2d 271, 274 (Tenn. 1998). Thus, the trial court is granted considerable discretion in misdemeanor sentencing. *State v. Johnson*, 15 S.W.3d 515, 518 (Tenn. Crim. App. 1999).

- 4 -

The trial court has the authority to place a defendant on probation either after service of a portion of the sentence in confinement or immediately after sentencing. Tenn. Code Ann. § 40-35-302(e)(1)(2). However, defendants convicted of misdemeanors are not presumed eligible for alternative sentencing. *State v. Williams*, 914 S.W.2d 940, 949 (Tenn. Crim. App. 1995). A defendant bears the burden of establishing his suitability for probation, including showing that probation will serve the ends of justice and the best interests of the public and the defendant. *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2007). In determining whether to grant probation, a trial court should consider whether: (1) "confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;" (2) "confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses;" and (3) "measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant." Tenn. Code Ann. § 40-35-103(1)(A)-(C).

In imposing split confinement, the trial court articulated its reasons, as follows:

> So under 40-35-103, the [c]ourt considers, is confinement necessary to protect society by restraining the defendant with a long criminal history? Obviously, that is not the case here. [The defendant] has no criminal history. And so that factor weighs against confinement.
>
> Is it necessary to avoid depreciating the seriousness of the offense? I'm going to skip that one for now and come back to it.
>
> Is confinement particularly suited as effective deterrence to others for similar crimes? In all honesty, with you, in 26 years in the criminal justice field, I've never seen this charge before. I've never – at least never had a case before me as a prosecutor, four of which was nothing but a child sex abuse case prosecutor, and now ten years on the bench. And so it is not something that we're dealing with a whole lot. Usually it's much more extreme abuse, unfortunately. So I can't say that confinement is particularly suited as effective deterrence for others, 'cause I just never see it.
>
> Have measures less restricted frequently or recently been tried unsuccessfully? He's never been on probation before. He's never had any counseling. As [trial counsel] points out, that's what [Dr.] Adler[2]

---

[2] Dr. Adler performed the defendant's psychosexual risk assessment, which was admitted into evidence at the sentencing hearing.

recommends, that he be in a specific program. So that weighs against confinement as well.

And what is the potential or lack of potential for rehabilitation, both as to the length of the sentence or the manner of sentence? And so I think that goes hand-in-hand with number 2. Is it necessary to avoid depreciating the seriousness of the offense?

And so that brings me to Dr. Adler's report and the different perspectives in this case. First, I want to comment on the facts that we heard during the trial. This was a very unique case because the primary evidence in this case was a video of behavior that occurred out in the open. Clearly, [the defendant] was not trying to hide his behaviors from anyone. And then he reports to Dr. Adler things that make Dr. Adler find that maybe he's – he's not having empathy for the victim or doesn't understand the wrongness of his behavior. And I think that really is true. I don't think [the defendant], as he sits here now, or as he sat there on that date engaged in this behavior, was really thinking what he was doing was bad.

And as far as not taking responsibility for his actions, I never hold that against a defendant who has pled not guilty and is convicted after trial. If you plead guilty and then you come in and try to make excuses for your behavior, that does not go well with me. So I don't – I don't have a problem with him maintaining his innocence. But what that tells me is, we've got one of two things going on. We either have somebody who is a sociopath and is deceiving everybody and engaged in this sexual behavior in front of everybody just to sort of thumb his nose at everyone, or we have somebody who engages in what the jury thought, what the law believes, what, I think, 99.9 percent of the public would say is incredibly inappropriate behavior with a child.

I know families all have different – different levels of comfort with touch and kissing, but I don't think anybody in this community and, certainly, the law, I don't think, contemplates it this way, that kissing a child on your lips, who is not your child, is appropriate behavior. And I don't think [the defendant], sincerely and honestly, believes that there's anything wrong with that. And so that causes the [c]ourt great concern; that if he doesn't understand the wrongfulness of his behavior, then how can he ever really be successful in being rehabilitated?

Because of that, even though everything – all the factors weigh against confinement in this case, I think it's essential that [the defendant] feels consequences for the wrongness of his behavior. So I do think some confinement would be beneficial to that; however, when the [c]ourt has to consider what's the least restrictive measures in light of the fact that we don't have any genital touching, any of the types of serious abuse that we're used to seeing here, that they are kissing and that he's never been in trouble before, I do think a smaller period, other than 11 months and 29 days, is warranted.

And so there's not really a science to what that length of time should be. I've considered it and believe that each act of kissing the child on the mouth is deserving of 30 days in jail. I do believe that those should be consecutively. And so I think that the appropriate sentence is the 11 [months], 29 [days] to run consecutive, all time suspended, except for 90 days, the balance on supervised probation. The [Class] B misdemeanors just to run concurrently.

The record reflects that the trial court held a sentencing hearing prior to imposing the defendant's sentence and provided detailed findings as to why it ordered the defendant to serve 90 days in incarceration. The parties were afforded the opportunity to be heard on the issue of sentencing, and the trial court considered both the sentencing statute and the facts of the case. The trial court determined that confinement was necessary to avoid depreciating the seriousness of the offense. These findings are supported by the record. Accordingly, we conclude the defendant has not shown the trial court abused its discretion in imposing split confinement, and he is not entitled to relief.

### *Conclusion*

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
J. ROSS DYER, JUDGE